WILLIAM H. THOMAS (ISB 3154)
THOMAS, WILLIAMS & PARK, LLP
121 N. 9th St., Ste. 300
P.O. Box 1776
Boise, ID 83701-1776
Telephone: (208) 345-7800
Fax: (208) 345-7894
wmthomas@thomaswilliamslaw.com

**Attorneys for Plaintiffs**

## IN THE UNITED STATES DISTRICT COURT FOR THE STATE OF IDAHO

| | |
|---|---|
| PHYLLIS SMITH, an individual, and DIANA WOLD, an individual, <br><br>                     Plaintiffs, <br><br> vs. <br><br> NORTH STAR CHARTER SCHOOL, INC., an administratively dissolved Idaho non-profit corporation; MERIDIAN JOINT SCHOOL DISTRICT #02, an agency of the State of Idaho; ROBERT W. BAIRD & CO., a Wisconsin corporation; JIM BLANDFORD, an individual; JOSELITO ("JOE") H. deVERA, an individual; GEORGE COBURN, an individual; SALLIE HERROLD, an individual; KERRI PICKETT-HOFFMAN, an individual; JANA McCARTHY, an individual; and DAN HULLINGER, an individual; and DOES 1-5, <br><br>                     Defendants. | Case No. _____ <br><br> **COMPLAINT AND DEMAND FOR JURY TRIAL** |

COMPLAINT AND DEMAND FOR JURY TRIAL, P. 1

Plaintiffs Phyllis Smith ("Ms. Smith") and Diana Wold ("Ms. Wold") (at times, collectively the "Plaintiffs"), for their claims against defendants allege:

## I. NATURE OF THE ACTION

1.      North Star Charter School's Board of Directors decided to expand their charter school to include high school grades.  To do so, it was necessary to build a new school facility. They sold the existing school and used the proceeds to begin construction of the new school. The sale proceeds were insufficient to complete construction.  The Board of Directors, in 2007, retained a bond underwriter, Jim Blandford, to underwrite the bond offering.  In the course of his underwriting he became closely aligned with the Board chairman, Joe deVera and several other Board members.  Blandford also recommended a financial advisor, John Buck, to advise the Board.  Buck was also an investor.

2.      Plaintiffs Phyllis Smith North Star's former Principal, and Diana Wold, North Star's former Vice-Principal, were the two senior administrators in the school and reported to the Board of Directors.  The Board was, by its bylaws, an operating board and managed the business affairs of the school.

3.      The underwriting and placement of the bonds began in 2008.  The end of 2008 was at the height of the financial crisis.  Blandford prepared financial projections for the bonds based on salary and enrollment numbers that did not coincide with the actual numbers for the school.  Plaintiff Smith notified Blandford and board members that the pro-forma numbers were incorrect.  Despite this notification, the bond offering memorandum was based on the incorrect numbers and North Star was obligated to repay the bonds at a 9.5% rate.  The resulting annual

COMPLAINT AND DEMAND FOR JURY TRIAL, P. 2

payments to bondholders led to annual financial shortfalls of several hundred thousand dollars. Most members of the board knew of the shortfall and the underlying reasons for it. In an attempt to address the financial crisis, the board hired a full-time financial manager for the school and stripped Plaintiffs of any financial duties, although they did prepare a draft budget for 2010-11.

4.      When the 2010-2011 budget for North Star was being prepared, it was clear to Plaintiffs Smith and Wold that the school would have a deficit. Blandford quickly distanced himself from assuming any culpability and, instead, blamed Plaintiffs for all of the financial troubles. Blandford took behind-the-scenes control of the board. Most of the board members were willing accomplices.

5.      Plaintiffs pressed the board to explain the financial picture to stakeholders and encouraged the board to be transparent in its dealings. Plaintiff Smith repeatedly asked the board for authority to present a timeline of significant events leading up to the financial crisis. On multiple occasions, Plaintiffs were forbidden from speaking to stakeholders after the board removed their management duties.

6.      In retaliation for insisting that stakeholders be given honest financial information, Plaintiff Smith was placed on a leave of absence. Plaintiffs were later notified that North Star would not renew their contracts for the 2010-11 school year. Several board members accused Plaintiffs of financial mismanagement and an anonymous party or parties filed an ethics complaint against Plaintiff Smith with the Idaho State Board of Education. As of June 30, 2010, Plaintiffs were terminated from their jobs.

7.      Plaintiffs bring claims against the North Star and certain named individual members of the board of directors. Also named as defendants are the Meridian Joint School

COMPLAINT AND DEMAND FOR JURY TRIAL, P. 3

District #02, James Blandford and his employer, R.W. Baird, and the anonymous accusers of Plaintiff Smith.

8.      Plaintiffs' claims are based on violations of the 1983 Civil Rights Act arising under the First Amendment; the Idaho Protection of Public Employees Act (Whistleblower); common law torts of tortious interference with contract/prospective advantage, defamation and wrongful discharge.

## II. JURISDICTION

9.      This action arises under the Constitution of the United States ("First Amendment") and the provisions of 42 U.S.C. § 1983.  The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331, 1343(a) and 1343(a), and 42 U.S.C. §§ 1983 and 1988.  This court has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367.

## III. VENUE

10.      Because the acts at issue in this Complaint have all occurred in the District of Idaho, and because all parties are located in the District of Idaho, venue is proper pursuant to 28 U.S.C. § 1391(b).  The practices alleged to be unlawful were and are now being committed within the jurisdiction of the United States District Court for the District of Idaho, and venue is proper in the Southern Division of the United States District Court for the District of Idaho under D.Id.L.Civ.R. 3.1.

## IV. THE PARTIES

11.      Plaintiff Ms. Smith ("Plaintiff Smith") is a citizen of the United States and was a resident of Ada County, Idaho, when the events occurred and was an employee of North Star Charter School, Inc.

COMPLAINT AND DEMAND FOR JURY TRIAL, P. 4

12.     Plaintiff Smith was the Principal of North Star Charter School, Inc. and was employed pursuant to an employment contract.

13.     Plaintiff Ms. Wold ("Plaintiff Wold") is a citizen of the United States and was a resident of Canyon County, Idaho, when the events occurred and was an employee of North Star Charter School, Inc.

14.     Plaintiff Wold was the Vice-Principal of North Star Charter School, Inc. and was employed pursuant to an employment contract.

15.     Plaintiffs Smith and Wold are referred to collectively throughout the Complaint as Plaintiffs.  At all times relevant for this Complaint, Ms. Smith was Ms. Wold's mentor and supervisor and Ms. Wold was a principal-in-training.  Ms. Wold attended virtually the same meetings, was involved in most telephone conferences and participated in most of the events alleged in this Complaint along with Ms. Smith.  Therefore, unless referred to individually, all allegations in this Complaint are made on behalf of the two named Plaintiffs.

16.     Defendant North Star Charter School, Inc. ("North Star") was an Idaho educational corporation that has been administratively dissolved.  North Star operated under a charter agreement with defendant Meridian Joint School District #02 dated April 22, 2002 and amended as of March 13, 2007.

17.     Defendant North Star Charter School Board of Directors (the "Board," "Directors" or "Trustees") at all times relevant was and remains the policy-making, advising and evaluating body for North Star.  The Board has the duty of directing the financial means by which North Star's educational program is conducted.  The Board ensures that the community be informed of the needs, purposes, values, and status of the charter school.  The Board, as a board,

COMPLAINT AND DEMAND FOR JURY TRIAL, P. 5

has the full power and duty to manage and oversee the operation of North Star's business and to pledge the credit, assets and property of North Star when necessary to facilitate the efficient operation of the charter school.

18.     Defendant Meridian Joint School District #02 ("MSD") is a body corporate and politic established under the laws of the State of Idaho.  MSD is an agency of the State of Idaho with its administrative offices located at 1303 E. Central Drive, Meridian, Idaho.  MJS acts as North Star's "Authorized Chartering Entity."

19.     Defendant Robert W. Baird & Co. ("Baird") is a Wisconsin corporation with its headquarters located at 777 East Wisconsin Avenue, Milwaukee, Wisconsin.  According to its internet website, Baird describes itself as ". . . an employee-owned wealth management, capital markets, asset management and private equity firm with client assets of more than $75 billion. Leveraging our deep expertise and broad skills, we're dedicated to providing the best advice and service to our individual, corporate, institutional and municipal clients."  Upon further information and belief, Baird is licensed as a securities broker/dealer with the Idaho Department of Finance and has transacted business in Idaho.  According to records of the Idaho Secretary of State, Baird has not obtained a certificate of authority from the Idaho Secretary of State to transact business in the State of Idaho.

20.     Defendant Jim Blandford ("Blandford"), is employed as Managing Director of defendant Baird's Denver Public Finance office.  At all times relevant to this Complaint, Blandford was an agent of defendant Baird and acted within the scope of his employment.  To the extent Baird denies Blandford was within the scope of his employment, Blandford is named in his individual capacity.

COMPLAINT AND DEMAND FOR JURY TRIAL, P. 6

21.     At all relevant times hereto, defendant Joselito ("Joe") deVera ("deVera") was a citizen and resident of Ada County, Idaho.  deVera was at various relevant times a member of the North Star Board of Directors and/or was a Trustee.  deVera was a person acting under color of State law for purposes of 42 U.S.C. § 1983 and acted in his official capacities as Director or Trustee and participated in the governmental process and decisions alleged herein and acted under color of State law for purposes of 42 U.S.C. § 1983.  At all relevant times hereto, deVera was acting as final policymaker.  deVera is sued here in both his individual and official capacities.

22.     At all relevant times hereto, Sallie Herrold ("Herrold") was a citizen and resident of Ada County, Idaho.  Herrold was at various relevant times a member of the North Star Board of Directors and/or was a Trustee.  Herrold was a person acting under color of State law for purposes of 42 U.S.C. § 1983 and acted in her official capacities as Director or Trustee and participated in the governmental process and decisions alleged herein and acted under color of State law for purposes of 42 U.S.C. § 1983.  At all relevant times hereto, Herrold was acting as final policymaker.  Herrold is sued here in both her individual and official capacities.

23.     At all relevant times hereto, defendant Jana McCarthy ("McCarthy") was a citizen and resident of Ada County, Idaho.  McCarthy was at various relevant times a member of the North Star Board of Directors and/or was a Trustee.  McCarthy was a person acting under color of State law for purposes of 42 U.S.C. § 1983 and acted in her official capacities as Director or Trustee and participated in the governmental process and decisions alleged herein and acted under color of State law for purposes of 42 U.S.C. § 1983.  At all relevant times hereto, McCarthy was acting as final policymaker.  McCarthy is sued here in both her individual and

COMPLAINT AND DEMAND FOR JURY TRIAL, P. 7

official capacities.

24.     At all relevant times hereto, defendant Kerri Pickett-Hoffman ("Hoffman") was a citizen and resident of Ada County, Idaho. Hoffman was at various relevant times a member of the North Star Board of Directors and/or was a Trustee. Hoffman was a person acting under color of State law for purposes of 42 U.S.C. § 1983 and acted in her official capacities as Director or Trustee and participated in the governmental process and decisions alleged herein and acted under color of State law for purposes of 42 U.S.C. § 1983. At all relevant times hereto,Hoffman was acting as final policymaker. Hoffman is sued here in both her individual and official capacities.

25.     At all relevant times hereto, defendant Dan Hullinger ("Hullinger") was a citizen and resident of Ada County, Idaho. Hullinger was at various relevant times a member of the North Star Board of Directors and/or was a Trustee. Hullinger was a person acting under color of State law for purposes of 42 U.S.C. § 1983 and acted in his official capacities as Director or Trustee and participated in the governmental process and decisions alleged herein and acted under color of State law for purposes of 42 U.S.C. § 1983. At all relevant times hereto, Hullinger was acting as final policymaker. Hullinger is sued here in both his individual and official capacities.

26.     At all relevant times hereto, defendant George Coburn ("Coburn") was a citizen and resident of Ada County, Idaho. Coburn was at various relevant times an employee of North Star. Coburn managed North Star financial matters. Coburn was a person acting under color of State law for purposes of 42 U.S.C. § 1983 and acted in his official capacity and participated in the governmental process and decisions alleged herein and acted under color of State law for

COMPLAINT AND DEMAND FOR JURY TRIAL, P. 8

purposes of 42 U.S.C. § 1983. At all relevant times hereto, Coburn was acting as final policymaker. Coburn is sued here in both his individual and official capacities.

27.     At all relevant times hereto, defendants Does 1-5, whose true names have been withheld from Plaintiff Smith and whose names are unknown to Plaintiff Smith, were and are persons acting under color of State law for purposes of 42 U.S.C. § 1983. Does 1-5 acted in his/her/its or their official capacities and participated in the governmental process and decisions alleged herein and acted under color of State law for purposes of 42 U.S.C. § 1983. At all relevant times hereto, Does 1-5 were acting as final policymakers. In the alternative, Does 1-5 were acting solely within their corporate or individual capacities.

## AGENCY/JOINT VENTURE

28.     At all times herein mentioned, defendants, individually and collectively, and affiliates not herein named, are and were agents or joint venturers of each of the other defendants, and in doing the acts alleged herein were acting within the course and scope of such agency or joint venture. Each defendant had actual and/or constructive knowledge of the acts of each of the other defendants, and ratified, approved, joined in, acquiesced in, and/or authorized the wrongful acts of each co-defendant, and/or retained the benefits of said wrongful acts.

## AIDING AND ABETTING

29.     Each defendant aided and abetted, encouraged, and rendered substantial assistance to the other defendants in breaching their obligations to Plaintiffs and in violating the law. In taking action, as alleged herein, to aid and abet and substantially assist the commissions of these wrongful acts and wrongdoing complained of, each of the defendants acted with an awareness of his, her or its primary wrongdoing and realized that his, her or its conduct would substantially

COMPLAINT AND DEMAND FOR JURY TRIAL, P. 9

assist the accomplishment of the wrongful conduct, wrongful goals and wrongdoing.

## CONSPIRACY

30.     Defendants, and each of them, knowingly and wilfully conspired, engaged in a common enterprise and engaged in a common course of conduct to accomplish the wrongs complained of herein.  The purpose and effect of the conspiracy, common enterprise and common course of conduct complained of was, *inter alia*, to deprive Plaintiffs of their rights under the United States Constitution.  Each Defendant was a direct, necessary and substantial participant in the conspiracy, common enterprise and common course of conduct complained of herein, and was aware of its overall contribution to and furtherance thereof.  Defendants' wrongful acts include, *inter alia*, all of the acts that each of them are alleged to have committed in furtherance of the wrongful conduct complained of herein.

## FACTUAL ALLEGATIONS

31.     North Star began operations as an Idaho charter school in Eagle, Idaho, in the 2003-2004 school year with approximately 265 students.  North Star added new  grades in subsequent years.

32.     At all times relevant to this Complaint, the Board, according to Article 4 of the Bylaws of the Charter School Corporation

> . . . shall consist of Directors elected or appointed for a two (2) year term of office as set forth below.  The number of Directors constituting the Board of the Corporation shall not be less than five (5) or more than seven (7) Directors.  The function of the Board can be described as policy making, advising and evaluating.  The Board **shall have the further duty of directing the financial means by which the educational program is conducted.  They shall also ensure that the community be informed of the needs, purposes, values and status of the charter school.**

COMPLAINT AND DEMAND FOR JURY TRIAL, P. 10

Section 4.2 Powers of the Board of Directors

The Board, as a Board, **shall have the full power and duty to manage and oversee the operation of the Corporation's business** and to pledge the credit, assets and property of said Corporation when necessary to facilitate the efficient operation thereof.  Authority is given to the Charter School Board of Directors by the State of Idaho as provided in the "Public Charter  Schools Act of 1998."  (I.C. 33-5201).

Section 4.3 Election of Directors

(a)  During the initial year of operation, the Board shall be comprised of the Directors listed in the Articles of Incorporation and any other Directors elected by the then current Board or appointed in accordance with provisions of Section 4.3(c).

(b)  No more than two (2) Directors may be a parent with one or more children attending North Star Charter School.

(c)  One of the Directors may be appointed by the Board of Trustees of the Joint School District No. 02, Meridian Idaho.

(d)  After the initial year of operation, Directors **will be elected to fill vacancies by vote of stakeholders** of the Corporation at the Corporations annual meeting.  As used herein, **"Stakeholders" shall mean the parents and guardians of pupils then attending North Star Charter School, faculty and employees of North Star Charter School, members of the North Star Charter School Parent-Faculty Association and such other persons and entities as the Board determines to be stakeholders of the Corporation.**  (Bold emphasis added.)

33.     In response to pressure from North Star parents, in March 2007, MSD authorized North Star to add high school education.

34.     In order to accommodate an expanded enrollment, the Board in August 2008 resolved to sell its facility located at 1400 North Park Lane, Eagle, Idaho, to purchase property located at 839 North Linder in Eagle, Idaho ("Linder Property"), and to build a new school building.

COMPLAINT AND DEMAND FOR JURY TRIAL, P. 11

35.     As a condition of MSD's approval for the high school expansion, MSD encouraged that North Star provide either an advanced placement program or an International Baccalaureate Diploma Programme ("IB").  The Board decided to pursue an IB program.

36.     In general, any school offering IB must go through an authorization process.  The process is designed to ensure schools are well prepared to implement the programme successfully.  As part of the authorization process, all educators must go through IB training prior to authorization.

37.     In early 2007, the Board retained Blandford as a financial advisor and underwriter for a municipal securities offering the Board deemed necessary in order to finance the purchase of the Linder Property and to construct the new school facility.  At the time Blandford was retained, Blandford worked for A.G. Edwards & Sons, Inc., a securities firm.

38.     Throughout 2007, Blandford and Board Chairman deVera worked to secure interim and long-term financing to complete the land acquisition and construction of the new school.  North Star provided Blandford with all financial information he requested.

39.     In October 2007, A.G. Edwards was acquired by Wachovia Corporation ("Wachovia).  Blandford continued to provide financial advice, serve as underwriter and prepare North Star's bond offering as an employee of Wachovia.

40.     In November 2007, Blandford prepared and sent to deVera a 10-year budget format for North Star stating, *inter alia*, that "[b]ased upon the revenue and expenditure projections, the School will maintain adequate coverage ratios and fund balances after this fiscal year to support a bond issue which will fund $6.1 million in construction and $1.5 million in land acquisition costs."

COMPLAINT AND DEMAND FOR JURY TRIAL, P. 12

41.     In December 2007, Standard & Poor's met with representatives of North Star to evaluate the rating it would give to a bond issued by North Star.

42.     In January 2008, Board members met with the architects who were to design the new school.

43.     In February 2008, Blandford estimated that construction costs for the new building would be approximately seven million dollars ($7,000,000) with annual debt service between five and six hundred thousand dollars ($500,000 – $600,000).

44.     Between January 2008 and June 2008, the Board signed employment contracts with teachers for the 2009-2010 school year.

45.     In early 2008, deVera negotiated an interim construction financing loan with Bank of the Cascades.  On or about May 13, 2008, the Board approved the Bank of the Cascades interim financing loan.

46.     On or about June 30, 2008, the Board approved Kreizenbeck Constructors ("Kreizenbeck") to build the school.  Kreizenbeck's construction manager, Joseph Saucerman, was closely associated with deVera in another charter school where Saucerman was chairman of the board.

47.     According to records from the Idaho Secretary of State, on July 14, 2008, deVera organized an Idaho limited liability company, Eureka Consulting, LLC.  Upon information and belief, the business purpose of Eureka Consulting, LLC was to provide consulting services to charter schools.

48.     Upon information and belief, after Kreizenbeck began construction of the new school building in October, Board member Brent Pipal argued that the building project should be

COMPLAINT AND DEMAND FOR JURY TRIAL, P. 13

halted because the financial projections indicated that North Star would not be able to meet the debt service requirements of the bonds.  Blandford and deVera convinced the Board to proceed with construction.

49.     On or about November 25, 2008, the Board approved Kreizenbeck as the contractor to build the new school even though construction had already begun.

50.     Before and during the November 25, 2008, Board meeting, Blandford and the Board knew that North Star would not be able to meet the debt service requirements under the proposed bonds.  Blandford, deVera and other Board members had by this time started to discuss refinancing the bonds because they were aware that North Star would not be able to afford the debt payments it would be required to make under the bonds.

51.     During the November 25, 2008, Board meeting Blandford presented a report on financing options.  The minutes from that meeting state:

> Jim Blandford with Wachovia Securities presented the board with an update of the financial market.  Since September, the market has been very erratic, but has gradually gotten better.  The market of bonds for Charter Schools is called High Yield Tax exempt funds.  When talks of bonds started, the rate was 5.75%.  Mr. Blandford suggested getting a construction loan until the first of the year, giving the market time to stabilize.  See attached list of possible lenders.  Also attached is a proposed financing schedule; overall sources and uses of funds; and summary of funds available for land acquisition, site work and construction.  The bond would have a 10 year maturity.  The school is allowed under tax law to refinance through an advance refunding within that time period before the bonds are called.   Bottom line is that if interest rates move about 2 percentage points then it becomes economically advantageous to the school to do an advance refund and hopefully get the payments down.  That can happen anytime between the beginning of the loan until year 10.  Principal Smith asked Mr. Blandford to prepare a historical and projected operating income and expenditures spreadsheet, which is attached.  Mr. Blandford stated that if there was a way to get a construction loan until construction is completed, that is what he

recommends.  He proposes getting the bond issue ready, but also talk to the construction loan lenders to see what can be done.  A decision needs to be made by January 6, 2009.  Trustee Carroll asked if there should be a target wait list and Mr. Blandford stated that North Star will need to focus on grades 7-12. Chairman deVera also mentioned that Jo Bolen, North Star's financial auditor, was involved with the numbers and she feels comfortable with this as well. (Emphasis added.)

52.     During the November 25, 2008, Board meeting Blandford presented a proposed

Financing Schedule for the bonds.  The parties involved with all phases of the bond issue

included:  Idaho Housing & Finance Association (Issuer), Skinner Fawcett (Issuer's Counsel),

North Star Charter School (Borrower), The Rose Law Group (Borrower's Counsel), Jo Bolen

(Borrower's Auditor), Skinner Fawcett (Bond Counsel), Quarles & Brady (Disclosure Counsel),

Wachovia Securities (Underwriter), and Well Fargo (Trustee).

53.     In December 2008, Blandford submitted a spreadsheet to U.S. Bank prepared by

North Star's auditor showing historical and projected revenues and expenditures for North Star.

The submission of this information, as well as a North Star Investor Summary of 9-12-08, a

North Star October Budget Report, Idaho Audited Financial Statements 2007 and 2008,

Foundation Calculation 2007 and 2008, and the June 2008 Budget Report was submitted as part

of a construction loan application.

54.     On or about January 15, 2009, the Board passed a resolution authorizing

Wachovia to manage a bond offering for the school.  Blandford was in charge of the bond

offering for the school on behalf of Wachovia.  Blandford continued to work closely with deVera

on the bond offering.

55.     In January 2009, Plaintiffs Smith and Wold held a conference call with Blandford

to discuss the historical and projected bond spreadsheet Blandford had created for investors.

COMPLAINT AND DEMAND FOR JURY TRIAL, P. 15

Plaintiffs told Blandford that the enrollment and salary line items were wrong.  Plaintiffs told

Blandford:

>    55.1  The salary line item was wrong because the Board had signed
>
>    contracts in 2008 with teachers for the 2009-2010 school year and
>
>    Blandford had not calculated those costs.
>
>    55.2  The enrollment line item was estimated to be above 800
>
>    students, but, Blandford insisted that the projections use an enrollment
>
>    figure of 728.

56.     Blandford told Plaintiffs that the numbers that had to be included were tight for

the investors and that North Star had to make it work with those figures.  Blandford said the

projections had to be adjusted to meet a required ratio for the limited offering he was preparing.

57.     Plaintiff Smith notified deVera of Blandford's use of incorrect numbers for

enrollment and salaries.

58.     On or about February 12, 2009, the Board approved Baird as the bond

underwriter.  Blandford began working for North Star as *an agent* of Baird.

59.     On or about February 12, 2009, the Board approved John Buck ("Buck") as a

financial buyer and/or agent to help North Star sell the bonds.  Buck was also an investor who

purchased bonds.

60.     On or about February 25, 2009, the Idaho Housing and Finance Association

("IHFA") issued its Nonprofit Facilities Revenue Bonds (North Star Charter School, Inc. Project)

Series 2009A in the aggregate principal amount of $11,355,000 and its Nonprofit Facilities

Revenue Bonds (North Star Charter School, Inc. Project) Series 2009B (federally taxable) in the

COMPLAINT AND DEMAND FOR JURY TRIAL, P. 16

aggregate principal amount of $420,000 (the "Bonds").

61.     The Bonds were rated "BB" by Standard and Poor's Rating Services.  The BB

major rating category is typically high-yield, high risk securities, sometimes referred to as "junk

bonds."  The Series 2009A Bonds had yields from 9.00% to 9.50%.  The Series 2009B Bonds

yielded 10.25%.

62.     Under the Bond Purchase Agreement between IFHA, North Star and Baird, as the

underwriter, Baird agreed to purchase the Bonds for IFHA at an underwriting discount of

$206,062.50.  The right of Baird to receive compensation in connection with the Bonds was

contingent upon the actual sale and delivery of the Bonds.

63.     Notwithstanding Plaintiffs' protests and complaints that Blandford was using

misleading enrollment and salary calculations, Blandford used the false enrollment figure of 728

for the 2009-2010 school year in the Limited Offering Memorandum that was provided to

investors.  For budget purposes, the board never relied on the 728 enrollment number.

64.     On or about February 26, 2009, Blandford and Buck reported to the Board that the

Bonds had been released for sale and that all but $3.5 million of the 2009A Bonds had been sold

and $200,000 of the 2009B Bonds remained.  Blandford reported that three potential buyers had

requested a site visit.  Blandford proposed a Bond closing on March 10, 2009.  Buck reported to

the Board that the Bond yield was 9.25%.

65.     On or about April 16, 2009, during a North Star Board of Directors meeting, the

minutes report that:

> Chairman deVera spoke about the challenge in the Bond market, the rates
> were higher than what was expected.  North Star is not done with the
> financing with the new building.  The cash flow is tight compared to what

it was before.  Jim Blandford is advising on some different options that North Star has.  Refinancing the building through a bank may be an option but it may be difficult.  USDA loan is no longer an option because the project is beyond 50% completed.  North Star has a year and a half to explore all options and get this done.  Chairman deVera and Trustee Wiskerchen will continue to work on this.

66.    Throughout 2009, Blandford, deVera and other Board members continued to work on refinancing the bonds, but were unsuccessful.  Upon information and belief, there was a shadow board of directors for North Star who were making financial and business decisions for North Star outside of the legally required open board meeting process.  Upon information and belief, these shadow meetings frequently involved deVera as the *de facto* shadow-chairman and usually included one or more actual Board members and, from time-to-time, certain parents.  Blandford was the puppeteer directing the financial actions of not only the shadow boards but also the Board for his and his employer's financial benefit.

67.    On or about May 1, 2009, Liza Walton (Walton) requested a Board executive session to "look over our teacher salaries, qualification, and course loads.  I would also like to request that Phyllis and Diana not be present for that session."  On May 4, 2010, Plaintiff Smith responded that she "would be happy to meet with you at any time to clear up any question you may have.  I'm not sure if Jim Blandford's figures are right regarding the $900,000 figure he used for this year [sic] salaries."  de Vera volunteered to also respond to Walton. (A true and correct copy of the May 1-4, 2010 email exchange between Walton and Plaintiff Smith is attached as Exhibit 1 and by this reference is incorporated into this Complaint as if set forth in full.)

68.     On or about June 18, 2009, deVera resigned from his position as a member of the

North Star board of directors.  DeVera continued to counsel and advise parents and Board

members on all matters until he was appointed to the Board in March, 2010.

69.     On or about January 26, 2010, Plaintiff Smith and defendant Herrold met with

Idaho School Superintendent, Tom Luna ("Luna") to notify Luna that North Star was having

trouble with its finances, including the prospect of making bond payments at the rates the bonds

were to be issued.  Plaintiff Smith asked Luna for help in creating a safety net for charter schools.

70.     On or about January 26, 2010, Herrold notified Plaintiff Smith that MSD

Superintendent, Linda Clark, had been contacted by the Idaho Department of Education

regarding North Star.  McCarthy told Superintendent Clark that North Star was 'anticipating

trouble next year with [it's] bond payment because [North Star has] not been able to refi."   (A

true and correct copy of a January 28, 2010 email exchange between Herrold and Plaintiff Smith

is attached as Exhibit 2 and by this reference is incorporated into this Complaint as if set forth in

full.)

71.     On or about January 27, 2010, Plaintiff Smith told Herrold that she had

"projection till 2013 that show [North Star is] not sustainable with the investor's version of

payment." (See Exhibit 2.)

72.     On or about January 28, 2010, the Board interviewed Coburn for a position as a

member of the Board.  Upon information and belief, the Board interviewers were impressed with

Coburn's financial background and at a later date decided to retain Coburn as a financial

consultant.

COMPLAINT AND DEMAND FOR JURY TRIAL, P. 19

73.     On or about February 8, 2010, Plaintiffs and Herrold met with the executive

director of the J.A. and Kathryn Albertson Foundation to ask for financial assistance for the next

school year.

74.     On or about February 10, 2010, Plaintiff Smith wrote to Herrold to report the

activities that had been undertaken to address the financial shortfall North Star was facing.  In

particular she asked Herrold who was going to tell the stakeholders about the financial

difficulties.  (A true and correct copy of a February 11, 2010, email exchange between Plaintiff

Smith and Herrold is attached as Exhibit 3 and by this reference is incorporated into this

Complaint as if set forth in full.)

75.     On or about February 18, 2010, Hullinger was appointed to the Board.

76.     On or about February 22, 2010, Hoffman was appointed to the Board and

immediately became chairman.

77.     On or about February 25, 2010, Plaintiff Smith sent a "North Star Charter School

Budget Proposal 2010-2011" to board chairman Hoffman.  This proposal was a draft that would

be finalized and presented to stakeholders.  In the narrative, Plaintiff Smith explained the

underlying reasons for the budget shortfall as follows:

> Although the Blandford projection for investors indicted a much more
> conservative estimation of enrollment and salaries, we were required to
> use them for projection only.  Blandford was notified that the salary
> estimation was inaccurate.  The Board moved to the new assumptions for
> enrollment and salaries since State revenue was cut by 4% for 2009-10. . . .
> Our 2009-10 enrolled student body was 837 to 728 as projected on the
> Blandford projection.

(A true and correct copy of the February 25, 2010, email and proposed budget is attached as

Exhibit 4 and by this reference is incorporated into this Complaint as if set forth in full.)

COMPLAINT AND DEMAND FOR JURY TRIAL, P. 20

78.     On or about March 3, 2010, Plaintiff Smith wrote to Hoffman asking to notify the stakeholders that North Star was having budget problems and to conduct a stakeholder survey in order to stop the rumor mill.  Hoffman refused to authorize Plaintiff Smith's communication with stakeholders.

79.     On or about March 8, 2010, Hoffman wrote an email to Board members explaining a telephone conversation she had with Blandford.  Hoffman said that Blandford had contacted deVera about coming back to the Board in order to "increase the financial acumen of the board and to ensure that knowledge about the bond is 'onboard'" (Blandford stated that the investors had counted on deVera's continued involvement when they made the investments.)  (A true and correct copy of Hoffman's March 8, 2010 email is attached as Exhibit 5 and, by this reference is incorporated into this complaint as if set forth in full.)

80.     On or about March 8, 2010, Blandford sent a letter to Hoffman, Chairman of the Board.  Blandford referenced that he and Hoffman had spoken on March 4, 2010.  (A true and correct copy of Blandford's March 8, 2010 letter is attached as Exhibit 6 and by this reference is incorporated into this Complaint as if set forth in full.)

81.     Upon information and belief, during the telephone conferences Herrold told Blandford that Plaintiffs had prepared a budget with a narrative that exposed Baird's and/or Blandford's use of false and misleading calculations as a basis for the Bonds' Limited Offering Memorandum.

82.     Despite being fully informed about the details of North Star's finances since 2007, between March 4, 2010 and March 8, 2010, Blandford and Buck contacted Coburn to obtain information on the status of Coburn's financial report to the Board.  A result of the discussion

COMPLAINT AND DEMAND FOR JURY TRIAL, P. 21

with Coburn, Blandford incredulously learns that North Star is experiencing financial difficulties and that North Star will not meet certain requirements of its loan agreement.

83.     Taking overt charge of the Board, on March 8, 2010,  Blandford "strongly" recommended that the Board "expand" the scope of Coburn's financial authority, taking control of all North Star financial matters.

84.     Despite being fully informed about the details of North Star's finances since 2007, on March 8, 2010, Blandford "strongly" recommended that Coburn review all outstanding teacher and other contracts.

85.     Despite being fully informed about the details of North Star's finances since 2007, on March 8, 2010, Blandford "strongly" recommended that Coburn review all salary and compensation increases since February 1, 2010.

86.     Despite being fully informed about the details of North Star's finances since 2007, on March 8, 2010, Blandford "strongly" recommended that Coburn prepare a fiscally responsible budget for North Star's 2010-2011 fiscal year.  Upon information and belief, Blandford was ordering the Board to prepare a budget that supported the false and misleading calculations in the budget he had used as a basis for the Bonds' Limited Offering Memorandum.

87.     Despite being fully informed about the details of North Star's finances since 2007, on March 8, 2010, Blandford "strongly" recommended the Board impose a moratorium on any additional contracts.

88.     In order to be assured that Baird's/Blandford's strong recommendations were fully implemented by the Board and to be confident that he had a powerful enforcer on the Board, on March 8, 2010,  Blandford directed the Board to:

COMPLAINT AND DEMAND FOR JURY TRIAL, P. 22

> Enact whatever measures are necessary to appoint Joe deVera to
> the North Star Board at the earliest possible date.  Given the large
> turnover of the Board membership since March 1, 2009, Joe's
> institutional knowledge of the School, the bond financing, and the
> financial management of the School are critical to resolving the
> financial challenges being faced by the School and retaining any
> credibility that exists with investors.

89.     On March 8, 2010, in a thinly veiled reference to Plaintiff Smith, Blandford

ordered the Board to take control of Plaintiff Smith, order her "to fully cooperate" with the

process of covering up Blandford's false and misleading statements, and stop her from contacting

stakeholders because doing so could impact enrollment.

90.     On or about March 15, 2010, Plaintiff Smith and Plaintiff Wold jointly drafted

and signed a statement for the Board to refute Blandford's allegations that the Plaintiffs had

provided inaccurate financial information to Blandford.  The statement also informed the Board

that Plaintiffs had notified deVera that the assumptions for enrollment and instructional salaries

used by Blandford were wrong.  (A true and correct copy of Plaintiffs' March 15, 2010 statement

is attached as Exhibit 7 and by this reference is incorporated into this Complaint as if set forth in

full.)

91.     On or about March 18, 2010, Coburn prepared a "North Star Charter School

Findings Report Current State of Financial Operations March 18, 2010 ("Coburn Report")."  In

his Summary Findings, Coburn concluded, *inter alia*, that the "Board is currently dysfunctional."

(A true and correct copy of  March 18, 2010 Coburn Report is attached as Exhibit 8 and by this

reference is incorporated into this Complaint as if set forth in full.)

92.     On or about March 18, 2010, the North Star Board met.  During the meeting the

Board resolved to release the Coburn Report findings to the Bond investors although it was not

COMPLAINT AND DEMAND FOR JURY TRIAL, P. 23

released until sometime after June 16, 2010. At the same meeting the By-Laws were amended to

facilitate Blandford's demand that deVera's be appointed to the Board.  The Board also resolved

to hire Coburn to run all business aspects of North Star under a $10,000 per month contract.  (A

true and correct copy of the March 18, 2010, Board minutes is attached as Exhibit 9 and by this

reference is incorporated into this Complaint as if set forth in full.)

93.     During March 2010, Plaintiffs continued to prepare a draft 2010-2011 budget for

North Star.  There continued to be a shortfall of approximately 300,000.  Hoffman and the Board

insisted that the school's budget fit the pro forma prepared by Blandford.

94.     Plaintiffs presented a proposed budget to the Board prior to the 2010 spring break.

Plaintiff Smith also presented a timeline and summary of events implicating Blandford in the

budget problems North Star was experiencing.  (A true and correct copy of a March 17, 2010

email from Plaintiff Smith is attached as Exhibit 10 and by this reference is incorporated into this

Complaint as if set forth in full.)

95.     On or about April 5, 2010, Plaintiff Smith had a telephone conversation with

Hoffman during which Hoffman said that she and the Board could not approve a budget in the

form presented by Plaintiff Smith.  Hoffman said the Board wanted a budget that fit the

Blandford parameters.  Hoffman reported that certain Board members felt like they had

defrauded the investors.  Throughout the conversation, it is apparent that Hoffman and the Board

are setting Plaintiffs up to become the scapegoats for the budgetary failings.

96.     On or about April 6, 2010, Plaintiff Smith had a conference with Hoffman and

Coburn.  Coburn and Hoffman listed the dramatic measures North Star would take to prepare a

balanced budget on the backs of teachers and the integrity of the school program in order to avoid

COMPLAINT AND DEMAND FOR JURY TRIAL, P. 24

disclosing the school's dire financial condition to the investors.  According to Coburn, Blandford was now disclaiming that the Bonds budget projections were a contract, but were, rather, "pro formas" subject to disclaimers.

97.     Coburn reported Blandford referred to the pro formas as fraudulent because they did not represent management's best knowledge.  It was also reported that Jana (McCarthy) believed the financials for the Bonds were fraudulent.  It was clear that Blandford, the puppeteer, was laying the groundwork to blame Plaintiffs.

98.     On or about April 7, 2010, in an email from Herrold to the Board, Herrold requested an executive session of the Board, in lieu of an open meeting in front of stakeholders, where the budget was to be discussed.  The executive session was "to discuss the performance of our administration."  (A true and correct copy of the April 7, 2010 Herrold email is attached as Exhibit 11 and by this reference is incorporated into this Complaint as if set forth in full.)

99.     On or about April 8, 2010, the Board, in lieu of an open Board meeting called for an executive session.  Upon information and belief, Hoffman, deVera and other Board members had been instructed by Blandford to get rid of the administration that was trying to expose Blandford's forced financial projections.  Hoffman and deVera accused Plaintiffs of signing contracts without the Board's authorization.  Hoffman and deVera accused Plaintiff Smith of being fiscally irresponsible and spending money foolishly.  Hoffman and deVera argued that Plaintiff Smith should be fired.  At the conclusion of the executive session, the Board put Plaintiff Smith on two-week administrative leave.  Plaintiffs were forbidden from communicating with any stakeholders about the budget proposal or any of the materials she had prepared demonstrating that Blandford's pro formas were contrary to any information Plaintiffs

COMPLAINT AND DEMAND FOR JURY TRIAL, P. 25

had provided to him while he was underwriting the Bonds.

100.    As of April 8, 2010, the Board stripped Plaintiffs of any and all authority to deal

with the financial matters of North Star.  Coburn and the Board, under the direction of Blandford,

were solely responsible for financial decisions. The Board relieved Plaintiffs of any obligation or

duty Plaintiffs may have had prior to April 8, 2010, to report on any North Star financial matter.

101.    On or about April 9, 2010, Board member Don Waniata resigned from the Board.

102.    At the April 20, 2010, Board meeting Plaintiff Smith was reinstated.  The Board

had stripped her of all of her business responsibilities, as well as any hiring authority for faculty

and staff.  (A true and correct copy of the minutes of the April 20, 2010 Board minutes is

attached as Exhibit 12 and by this reference is incorporated into this Complaint as if set forth in

full.)

103.    During an executive session of the April 20, 2010, Board meeting, Plaintiff Smith

underwent an examination concerning her involvement with the Bond and with the budget.

Plaintiff Smith wrote each of the questions down, repeated them aloud to the examiner, wrote her

responses and read her responses word-for-word back.  (A true and correct copy of a transcript of

the April 20, 2010, examination by Board is attached as Exhibit 13 and by this reference is

incorporated into this Complaint as if set forth in full.)

104.    On or about April 22, 2010, Plaintiff Smith, in an email to Hoffman, asked

whether Plaintiff Smith could present an updated timeline of events surrounding the school's

financial circumstances at a staff meeting in order to take a "step toward meeting the request for

transparency and information."  Hoffman refused to allow the presentation.  (A true and correct

copy of the April 22, 2010, email exchange between Plaintiff Smith and Hoffman is attached as

COMPLAINT AND DEMAND FOR JURY TRIAL, P. 26

Exhibit 14 and by this reference is incorporated into this Complaint as if set forth in full.)

105.    On or about April 24, 2010, Plaintiff Smith asked Hoffman for permission to hold meetings with parents to solicit their ideas on the budget.  Hoffman responded:  "The board is not supportive of you hosting meetings with parents to solicit ideas on budget or factors that impact budget without our specific instruction or George's specific instruction.  This includes sharing your timeline. – kerri."

106.    On or about April 26, 2010, Plaintiff Smith again asked Hoffman for authority to present a timeline of events to stakeholders in order to explain North Star's budget crisis.  Hoffman told Plaintiff Smith that the Board did not agree with the timeline and that "somehow" the Board approved "your" 2009-10 budget.  Hoffman told Plaintiff Smith that she "shouldn't have prepared the budget [she] gave for 2009-10."  Hoffman said the Board was concerned "there is still some liability [and] the word 'fraud' comes up."

107.    On or about April 27, 2010, Plaintiff Smith sent an email to the Board explaining the efforts she and Plaintiff Wold had taken to try to apply North Star's actual numbers to the Blandford Bond projections.  Plaintiff Smith wrote: "[o]ver the three-day weekend Diana and I put [the State budget] numbers into our funding formula spreadsheet which in turn fed into the 10 year projections that we have from Jim Blandford.  It became pretty apparent with the reductions in base salaries from the state that we would clearly need to bring our high school numbers up to full enrollment to offset the reduction in revenue.  We have not talked about this [a proposal] with teachers or parents and would like to start the dialog with the board first."

108.    On or about April 28, 2010, McCarthy, Hoffman, deVera, Coburn, and Herrold met with MSD Board of Trustees in a special board meeting.  Upon information and belief,

Hoffman accused Plaintiffs of creating the North Star budget crisis, explaining "the discrepancy between the pro forma used to obtain financing for [North Star's] building and actual expenditures for teacher and classified salaries." (A true and correct copy of the minutes of the April 28, 2010 MSD Board minutes is attached as Exhibit 15 and by this reference is incorporated into this Complaint as if set forth in full.)

109.     Upon information and belief, during the MSD special board meeting, McCarthy, Hoffman, deVera, Coburn, and Herrold reported to the MSD board of trustees that Plaintiff Smith had committed ethical violations and had initiated a "potential/pending ethics investigation." (A true and correct copy of the April 28, 2010 email from Hoffman to the Board is attached as Exhibit 16 and by this reference is incorporated into this Complaint as if set forth in full.)

110.     On or about May 5, 2010, Plaintiff Smith received an email from Wiskerchen in which he prepared a table comparing the actual North Star budget to Blandford's 10-year model. Plaintiff Smith replied: ". . . using Jim's [Blandford's] figures for both 2008-09 and for the 2009-10 projections brings us to inaccurate assumptions and conclusions:  At this point his numbers are not accurate and have been massaged.  Let's work with the actuals for this year as well as the raw numbers for the fall." Wiskerchen agreed that the Board should use actual numbers. In response Plaintiff Smith added:

> If you look at Jim Blandford's 10-year projection, you see that he
> used 728 as the enrollment for fall 2009.  I have objected to this
> many times because it is much too low.  In fact, if you look back
> even to the October dashboard, we were using 740 for numbers for
> 2009-10.  The reason he used this number is because this is the
> number that investors thought most conservative.  They wanted the
> projection to show we could make it at such a low enrollment.

COMPLAINT AND DEMAND FOR JURY TRIAL, P. 28

When that enrollment number is plugged in, other numbers adjust due to formulas built in to the system. So he saw this as a necessity to get the bond sold. It is not something that reflects neither where we are presently at as a school nor where we are at for present enrollment for the fall.

Months ago we had a work session when we spent time working with our finances and also what we would need for enrollment for the fall. We have been working with numbers such as 740 for quite some time. It could be that we are having some board e-mail chatter about the 728 number because either board members do not remember the numbers we have been discussing or they perhaps were not at that work session. So, unfortunately, assumptions are being made on inaccurate numbers.

(A true and correct copy of the May 5-6, 2010 email exchange between Plaintiff Smith and Wiskerchen with copies to deVera is attached as Exhibit 17 and by this reference is incorporated into this Complaint as if set forth in full.)

111.    On or about May 5, 2010, North Star received a notice of defect from MSD.

112.    On or about May 7, 2010, Hoffman confirmed in an email that MSD was initiating a formal investigation of Plaintiff Smith with the attorney general's office. In addition, Hoffman began to take steps to remove Board member Carroll, the Board member other than Waniata who supported Plaintiffs. (A true and correct copy of the May 7, 2010, Hoffman email to the Board is attached as Exhibit 18 and by this reference is incorporated into this Complaint as if set forth in full.)

113.    On or about May 13, 2010, the Board voted to not renew Plaintiffs' contracts. (A true and correct copy of the May 13, 2010, Board minutes is attached as Exhibit 19 and by this reference is incorporated into this Complaint as if set forth in full.)

COMPLAINT AND DEMAND FOR JURY TRIAL, P. 29

114.     On or about May 15, 2010, Plaintiff Smith requested an audio copy of the May 13, 2010, Board meeting.  On or about June 6, 2010, the Board clerk, Ellen Bates, advised Plaintiff Smith that the tape recording of the May 13, 2010, Board meeting had been erased.

115.     On or about May 17, 2010, North Star sent a notice to Plaintiff Wold that her employment contract would not be renewed.

116.     On or about May 27, 2010, Plaintiff Smith received a notice of complaint filed with the State Department of Education, Chief Certification Officer, alleging ethics violations. Upon information and belief, Does 1–5 filed the ethics violations allegations against Plaintiff Smith.  Despite repeated attempts to learn the identity or identities of Plaintiff Smith's accusers, the State Department of Education refused to identify the accusing parties.

117.     On or about June 2, 2010, Plaintiff Smith again asked Hoffman for permission to explain the factual circumstances leading to North Star's financial crisis.  Plaintiff Smith wrote in an email: "I have had requests from parents for more information regarding the bond process and how we got to this place we find ourselves in.  I think we are overdo[sic] in communicating the process the school went through in the last two year[sic].  More people are calling for information and transparency.  I would like to present the timeline of events for parents and teachers to see at our board meeting this Thursday.  I request this as an agenda item.  I've attached the spread sheet. (A true and correct copy of the June 2, 2010, email from Plaintiff Smith to Hoffman is attached as Exhibit 20 and by this reference is incorporated into this Complaint as if set forth in full.)

118.     On or about June 3, 2010, Hoffman responded to Plaintiff Smith's request to provide more information and transparency by stating: "I am not going to allow this to be on the

COMPLAINT AND DEMAND FOR JURY TRIAL, P. 30

agenda, Phyllis. We have an obligation to get through this budget process for the teachers.

Bringing up this issue will cloud our purpose for tonight and create confusion, chaos and more

blame. I am not interested in doing that."

119.   On or about June 3, 2010, Plaintiff Smith reminded Hoffman that the Board had

had the spreadsheet she had prepared since April 20, 2010, and that she had asked the Board for

editing and comments. Plaintiff Smith also said:

> I believe we are not communicating enough and are not putting out
> facts for our stakeholders to understand the process that the school
> went through during these last few years. What do we have to
> hide? We really can't over communicate–just under communicate.
> This is part of the transparency we aspire to and hold as our values.
> I've reattached the timeline. Let me know if anything else should
> be included.

(A true and correct copy of the timeline Plaintiff Smith sent to Hoffman on June 3, 2010 as an

attachment to her email is attached as Exhibit 21 and by this reference is incorporated into this

Complaint as if set forth in full.)

120.   On or about June 16, 2010, during a telephone conference with Bond investors,

Hoffman reported that North Star had a 2008-09 operating loss of $189,000 and that it would

have a 2009-10 loss of $300,000. Hoffman and deVera blamed Plaintiffs for the fiscal fiasco.

They said the Board had not been receiving consistent financial reports and that Plaintiffs did not

have the necessary financial acumen.

121.   Plaintiff Smith's employment contract with North Star was terminated on June 30,

2010.

122.   Plaintiff Wold's employment contract with North Star was terminated on June 30,

2010.

COMPLAINT AND DEMAND FOR JURY TRIAL, P. 31

## FIRST CLAIM FOR RELIEF

### Violation of Plaintiff's First Amendment Rights – Retaliation
### (All Defendants – Jointly and Severally)
### (42 U.S.C. § 1983)

123.    Plaintiffs incorporate by reference each allegation alleged above as though fully set forth herein.

124.    Plaintiffs' complaints about using a false, misleading and unsubstantiated budget analysis as a basis for offering to sell and selling over $11,000,000 in Bonds were complaints of actual and/or suspected violations of the law.

125.    Plaintiffs' repeated attempts to speak to stakeholders regarding mis-use of public funds, wastefulness and inefficiency in managing and operating a government entity were complaints about matters of public concern.

126.    Plaintiff's complaints about suspected violations of the law were made as a private citizens and not as a public employees.

127.    The Board's terminations of Plaintiffs' employment were motivated primarily and substantially by their exercise of their First Amendment rights to speak on matters of public concern.

128.    The Board had no adequate justification for their termination other than Plaintiffs' exercise of their First Amendment rights to speak on matters of public concern.

129.    By reason of the foregoing Constitutional violations, Plaintiffs have suffered immediate and irreparable injury to their persons resulting in the deprivation of their constitutional rights, privileges and immunities.  Plaintiffs experienced humiliation, degradation, mental distress, financial losses, loss of reputation, slander, defamation, and severe emotional

COMPLAINT AND DEMAND FOR JURY TRIAL, P. 32

anguish for which defendants are jointly and severally liable.

130.    Pursuant to 42 U.S.C. § 1988(b), Plaintiffs are entitled to recover their reasonable attorney fees as part of their costs in prosecuting their claims against defendants.

## SECOND CLAIM FOR RELIEF

**(North Star Charter School, Meridian Joint School District #2, Joe deVera, Sallie Herrold, Kerri Pickett-Hoffman, Jana McCarthy, Dan Hullinger and George Coburn)**
**(Violation of Idaho Code §§ 6-2101, *et seq.*, Protection of Public Employees)**

131.    Plaintiffs incorporate by reference each allegation alleged above as though fully set forth herein.

132.    Plaintiffs are public employees under the Idaho Protection of Public Employees Act.

133.    Plaintiffs, as alleged with particularity above, communicated in good faith and in a timely manner the existence of waste of public funds, property or manpower, or a violation or suspected violation of a law, rule or regulation adopted under the law of Idaho, a political subdivision of Idaho or the United States, in particular, suspected violations of securities laws.

134.    As a direct and proximate result of Plaintiffs' reporting and numerous attempts to report waste of public funds, property or manpower, or a violation, or suspected violation of laws, rules or regulations, defendants stripped Plaintiffs of certain duties and responsibilities, reduced them to subordinate positions and, ultimately, fired them.

135.    Defendants' wrongful employment actions include:

135.1   wrongful termination of employment;

135.2   wrongful deprivation of career opportunity; and

135.3   negligent evaluation of Plaintiffs.

COMPLAINT AND DEMAND FOR JURY TRIAL, P. 33

136.    As a direct and proximate result of defendants' adverse actions against them, Plaintffs incurred damages for which they are entitled to recover.

137.    Under the Idaho Protection of Public Employees Act, Plaintiffs are entitled to recover their reasonable attorney fees as part of their costs in prosecuting their claims against defendants.

## THIRD CLAIM FOR RELIEF

### (Baird and Blandford)
### (Tortious Interference with Contract and/or Prospective Advantage)

138.    Plaintiffs incorporate by reference each allegation alleged above as though fully set forth herein.

139.    Plaintiffs had employment contracts with North Star that were automatically renewable, unless North Star gave notice of its intent not to renew the employment contracts. Until May 2010, North Star had automatically renewed Plaintiffs' employment contracts.

140.    Blandford, as an agent of Baird, knew or should have known that Plaintiffs had automatically-renewing employment contracts with North Star.

141.    Blandford, prior to the Bond closing, began a campaign of slander and defamation falsely alleging that Plaintiffs were the source of misinformation for pro formas that Blandford had used as a basis for his financial projections for the Bonds.

142.    Blandford's libel and slander imputed conduct to Plaintiffs – fraud – that constituted a criminal offense.

143.    Blandford's libel and slander ascribed conduct to Plaintiffs that was incompatible with Plaintiffs' professions as educators and adminstrators.

COMPLAINT AND DEMAND FOR JURY TRIAL, P. 34

144.    Blandford's libel and slander were intentional in that, through his course of conduct, Blandford falsely accused Plaintiffs of fraudulent conduct thereby covering up his own intentional misstatements of financial facts in the Bond offering.

145.    Blandford's libel and slander was the basis used by his co-conspirators on the Board used to terminate Plaintiffs' contracts.  The co-conspriators were attempting to shift any culpability from Blandford and themselves to Plaintiffs.

146.    As a direct and proximate result of Blandford's tortious interference with contract and/or prospective advantage, Plaintiffs were damaged in amounts to be proven at trial.

## FOURTH CLAIM FOR RELIEF

### (Baird and Blandford)
### (Defamation *Per Se*)

147.    Plaintiffs incorporate by reference each allegation alleged above as though fully set forth herein.

148.    Blandford, individually and as an agent of Baird, beginning in at least 2009, engaged in a campaign to shift the blame for false and misleading financial information he included in the Bond offering to Plaintiffs.

149.    In the blame-shifting process, Blandford made false and defamatory statements to third persons imputing conduct constituting a criminal offense or, at a minimum, moral turpitude. Blandford's defamatory statements also ascribed to Plaintiffs conduct, characteristics or a condition incompatible with the proper conduct of their professions as educators and administrators.

150.    Blandford's defamatory statements were libelous and slanderous *per se*.

151.    As a direct and proximate result of Blandford's defamation *per se*, Plaintiffs' reputations were damaged and Plaintiffs suffered monetary damages in amounts to be determined at trial.

## FIFTH CLAIM FOR RELIEF

### (Does 1-5)
### (Defamation Per Se – Plaintiff Smith)

152.    Plaintiffs incorporate by reference each allegation alleged above as though fully set forth herein.

153.    Does 1-5 intentionally caused a complaint to be filed against Plaintiff Smith with the Chief Certification Officer of the Idaho State Department of Education.

154.    The Complaint falsely alleged that Plaintiff Smith engaged in unethical conduct punishable as a crime under Idaho Code.

155.    The Complaint falsely alleged that Plaintiff Smith engaged in conduct that violated the ethical requirement that she handle public funds and property with a high level of honesty, accuracy, and responsibility.

156.    The allegations are false and defamatory *per se* and have and will damage Plaintiff Smith's reputation as an educator and administrator.

157.    As a direct and proximate result of Does 1-5 defamation *per se*, Plaintiff Smith has been damaged in an amount to be proved at trial.

## SIXTH CLAIM FOR RELIEF

### (All Defendants)
### (Intentional/Negligent Infliction of Emotional Distress)

158.    Plaintiffs incorporate by reference each allegation alleged above as though fully set forth herein.

159.    The actions of all Defendants as described in this Complaint were intentional and reckless.

160.    The actions of all defendants toward Plaintiffs were negligent.

161.    All defendants' conduct toward Plaintiffs was extreme and outrageous.

162.    As a direct and proximate result of defendants' negligent, intentional, reckless, extreme and outrageous conduct toward Plaintiffs, Plaintiffs suffered severe emotional distress for which she is entitled to recovery.

163.    As a direct and proximate result of the acts of defendants, Plaintiffs suffered past and further lost wages, medical expenses, severe mental anguish, physical discomfort and other damages mental, physical and emotional.

## PRAYER

**WHEREFORE**, Plaintiffs request the following relief:

1. Enter a judgment in favor of the Plaintiffs and against the Defendants, jointly and severally, for the actual or compensatory and presumed damages sustained by the Plaintiffs pursuant to 42 U.S.C. Sections 1983, 1988 et seq, for the violations of their First Amendment rights under the Constitution of the United State of America and any other injury or claim that

COMPLAINT AND DEMAND FOR JURY TRIAL, P. 37

may be discovered during the discovery process for which the law holds the Defendants liable and responsible in an amount to be determined by a jury;

2.  A judgment in favor of the Plaintiffs and against the Defendants, jointly and severally, for punitive or exemplary damages, for the outrageous, willful, wanton and intentional conduct that resulted in a gross or reckless disregard for the welfare, safety, rights, privileges or immunities of the Plaintiffs, in an amount to be determined by the jury;

3.  A judgment in favor of the Plaintiffs and against the Defendants, jointly and severally, for Plaintiffs' reasonable attorneys' fees pursuant to 42 U.S.C. Section 1988 et seq, all costs of this action and related litigation expenses and expert fees;

4.  A judgment for such other relief, general or specific, as the Court may deem appropriate, just and equitable in the premises.

## JURY DEMAND

**PLAINTIFFS HEREBY DEMAND A TRIAL BY JURY ON ALL ISSUES.**

DATED this 15th day of December, 2010.

THOMAS, WILLIAMS & PARK, LLP

William H. Thomas
Attorney for Plaintiffs

COMPLAINT AND DEMAND FOR JURY TRIAL, P. 38